Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL S., and M.S.,<br><br>    Plaintiffs,<br><br>vs.<br><br>BLUE SHIELD of CALIFORNIA, and the STANFORD UNIVERSITY BLUE SHIELD HEALTHCARE + SAVINGS PLAN.<br><br>    Defendants. | COMPLAINT<br><br>Case No. 2:22-cv-00382 - DBP |

Plaintiffs Michael S. and M.S., through their undersigned counsel, complain and allege against Defendants Blue Shield of California ("BSC") and the Stanford University Blue Shield Healthcare + Savings Plan ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Michael and M.S. are natural persons residing in Santa Clara County, California. Michael is M.S.'s father.

1

2.  BSC is an independent licensee of the nationwide Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3.  The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Michael was a participant in the Plan and M.S. was a beneficiary of the Plan at all relevant times.

4.  M.S. received medical care and treatment at Evoke Entrada ("Evoke") from July 12, 2017, to September 27, 2017, and Kolob Canyon Residential Treatment Center ("Kolob Canyon") from September 28, 2017, to August 10, 2018. These are treatment facilities located in Washington County, Utah, and provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5.  BSC denied claims for payment of M.S.'s medical expenses in connection with her treatment at Evoke and Kolob Canyon.

6.  This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7.  Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BSC does business in Utah through its network of affiliates, and the treatment at issue took place in Utah. In addition, Stanford University has partnerships, joint research projects, and other interactions with the University of Utah and other institutions of higher education in the State of Utah and is found in Utah.

8.  In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be

responsible to pay and that would not be incurred if venue of the case remains in Utah.
Finally, in light of the sensitive nature of the medical treatment at issue, it is the
Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely
their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the
benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for
appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants'
violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),
an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29
U.S.C. §1132(g).

## BACKGROUND FACTS

### M.S.'s Developmental History and Medical Background

10. M.S. started therapy when she was in elementary school to address a variety of emotional
and behavioral problems. It didn't end up helping her very much and she became
convinced that therapy didn't work.

11. As she grew older, M.S. began having increasingly severe anxiety and became more
withdrawn, sad, irritable, had a poor appetite, had problems sleeping, and had troubles in
school. She started meeting with a new therapist.

12. In March of 2015, M.S. told her school counselor that she was planning to kill herself
using a rope. She was placed on antidepressants and started attending a program for at-
risk students called THRIVE after school, and she was given an individualized education
plan.

13. Her pediatrician scolded her for gaining weight and afterwards she went home and attempted to overdose on her antidepressants. She started attending a program to help reduce her anxiety, and while she improved initially, she quickly stopped taking care of herself. Her hygiene became so poor that people started avoiding her and she lost friends.

14. M.S. started having manic episodes and those around her suspected that she suffered from bipolar disorder. She again told a school counselor that she was planning on killing herself and it was discovered that she had been self-harming by cutting and she had also been restricting her food intake and purging. She then began receiving inpatient mental health treatment and attending a program at the Menninger Clinic.

15. The staff at the Menninger Clinic opined that M.S.'s manic episodes were likely a consequence of the medications she was taking rather than bipolar disorder. She often refused to participate in therapy while there stating that she was convinced it didn't work.

16. BSC refused to provide further coverage for M.S.'s treatment at the Menninger Clinic, and she then attended a partial hospitalization program for a month followed by intensive outpatient treatment, but it was ineffective. She told her psychiatrist she wanted to kill herself and again started receiving inpatient care.

17. She then began attending an intensive outpatient program called Aspire. Her treatment team at Aspire recommended that she receive further care in a residential setting. M.S. continued to self-harm despite her parents' efforts to keep her safe by locking up sharps and materials she could use to harm herself.

18. M.S. often used self-harm as a mechanism to punish herself. For instance, if she didn't get her color guard routine down perfectly she would repeatedly injure herself by hitting herself on the head with a flagpole.

19. M.S. often refused to go to school and her anxiety became severe enough that even commonplace things like riding a bicycle or opening a combination lock for her locker made her so anxious that she was unable to do them.

**Evoke**

20. M.S. was admitted to Evoke on July 12, 2017.

21. BSC denied payment for M.S.'s treatment in a series of Explanation of Benefits ("EOB") statements. The EOB's stated that BSC had determined care to not be medically necessary and that BSC would provide "the scientific or clinical judgment used for the determination" free of charge upon request.

22. On October 5, 2018, Michael submitted an appeal of the denial of payment for M.S.'s treatment. He wrote that he had contacted BSC to obtain a more detailed justification for the denial and was told that this would not be provided until he submitted an appeal unless he compelled BSC to release the information by serving them with a subpoena.

23. Michael stated that this clearly contradicted the statement in the EOB's that more information would be provided upon request. Eventually he was able to convince the BSC representative to give him a verbal denial and was told that payment was denied due to a lack of danger of self-harm.

24. Michael called again and spoke to a different representative and was told by the second representative that she could not provide specific details of the denial and could only confirm or deny based on specific questions. He asked the representative if the denial was related to a lack of self-harm and was told that was "the gist" of it.

25. Michael called once again and spoke to a different BSC representative and was finally told by this third representative that he could be provided with a copy of the denial if he

5

submitted a form confirming he was M.S.'s representative. Michael did so and was finally provided with a denial letter dated August 30, 2018, this letter stated that:

> …After a review of the available clinical information, it does not appear that the member continued to require this level of care. There was no indication that the memberposed [sic] a realistic risk of self-harm, or that she posed a risk to others. There was no indication of any medication problems, or that the current prescribed medications could not be safely managed in standard outpatient care. There is no indication that the member is unable to effectively participate in a less structured environment involving an Intensive Outpatient Program or standard outpatient therapy for medication management by a psychiatrist on a standard outpatient basis. …

26. Michael argued that it was inappropriate to require an individual receiving residential treatment services to pose a threat to themselves or others or be experiencing suicidal or homicidal ideation as a condition for receiving care. He stated that these were requirements which were typical of acute inpatient hospitalizations not residential treatment.

27. He wrote that BSC appeared to have misstated the guidelines it had relied upon. According to the denial letter itself, BSC relied on the MCG 21st Edition, Behavioral Health Care, Major Depressive Disorder: Residential Care guideline(s). He stated that he had obtained a copy of these criteria and found that they made repeated references to other "Residential Acute Behavioral Health Level of Care" guidelines that were not referenced in the denial letter.

28. He quoted portions of the Milliman Care Guidelines for both acute inpatient hospitalization and residential treatment and voiced his concern that they were troublingly similar. He noted that each of these criteria required factors such as danger to self or others in order for treatment to be approved.

29. He asked why BSC would bother to differentiate between acute and non-acute types of care if in practice it placed essentially the same requirements on both types.

30. Michael alleged that BSC's denial was a violation of MHPAEA. He stated that an insurer could not impose limitations on mental health/substance abuse services unless they were comparable to and applied no more stringently than the limitations applied to medical/surgical benefits in the same classification.

31. He contended that BSC did not require individuals attending analogous medical or surgical facilities such as skilled nursing facilities to be suffering from acute medical impairments such as a heart attack before receiving care, however it did impose these types of requirements on sub-acute inpatient mental healthcare.

32. He argued that this constituted a violation of MHPAEA and that BSC had set up a standard for residential treatment care that was "not in alignment with the general standards of medical care," and was "nearly impossible to meet." He stated that this was particularly troubling as BSC did not appear to have comparable medical or surgical criteria for medical services such as skilled nursing care.

33. He stated that using processes and factors to limit the availability of mental healthcare without doing so to the same degree for analogous medical or surgical services constituted a non-quantitative treatment limitation in violation of MHPAEA. He requested that BSC perform a MHPAEA compliance analysis and provide him with a copy of the results.

34. He argued that M.S. had longstanding behavioral problems including suicide attempts and self-harm which precluded her ability to function in a normal setting and had not been able to be adequately addressed at other levels of care.

35. He included letters of medical necessity with the appeal, in a letter dated August 30,

2018, Jill Krafts, LCSW, wrote in part:

> I am a Licensed Clinical Social Worker who has treated [M.S.] since 2015. She is diagnosed with Major Depression, Recurrent, Severe with Psychotic Symptoms (ICD-10 F33.3), Generalized Anxiety Disorder (ICD-10 F4.1), and Social Anxiety Disorder (ICD-10 F40.11). She is also treated by psychiatrists Leena Khanzode, MD and Wendy Froehlich-Santino MD. I am writing to address your findings that [M.S.] did not require long-term inpatient care, posed no realistic risk of self-harm, had no medication problems, and could participate effectively in an Intensive Outpatient Program or standard outpatient therapy.

> A review of her treatment over the past few years will reveal quite clearly that [M.S.] presented a very realistic risk of self-harm which was agreed upon by multiple clinicians across different treatment settings in different cities and states. Her medication was not effective, and she participated in many different outpatient therapy programs with absolutely no improvement. Every provider who has encountered [M.S.] felt that in his or her professional opinion, and according to generally accepted standards of medical care, that she did require serious, immediate, and ongoing intervention that could only be provided by a long-term inpatient stay. …

> Sending [M.S.] to long-term residential treatment centers was an extremely difficult decision for her parents and for her treatment team. We all tried very hard to avoid this step, but it became clear over time that it was absolutely necessary because [M.S.] wasn't safe at home or school. Her depression and anxiety symptoms were severe and not improving despite numerous different therapy and medication interventions. Her suicidal ideation was persistent and severe, and she consistently harmed herself and made multiple attempts to kill herself. Fortunately she was able to express her suicidal ideation to providers, so that they could take steps to prevent her from further action which could very well have endangered her life. Her parents locked up sharps and medications daily, and yet [M.S.] still found ways to harm herself. No outpatient program or brief inpatient hospital stay created any improvement and [M.S.] was clearly not able to participate in therapy in an effective manner.

> As you know, [M.S.] just graduated from Kolob Canyon Residential Treatment Center after a stay of nearly a year. Prior to that, she spent two months in a wilderness program at Evoke Therapy. At the conclusion of those two months, the clinicians there felt she was not ready to return home and required a much longer stay, which is why they recommended Kolob. I am very happy to report that [M.S.] is doing significantly better thanks to these residential programs, and she no longer presents a risk to herself. Her huge improvement attests to the fact that the drastic move of sending her away for a year to two residential programs was absolutely necessary to bring about the successful treatment of her depression,

anxiety, and suicidal thoughts. No other therapeutic interventions prior to this led to any alleviation of her symptoms, increase in stability, or decrease in her risk of self-harm or suicide.

At no time has there been a single clinician who felt that [M.S.] didn't exhibit a realistic risk of self-harm or didn't require more intensive. Every single provider who encountered [M.S.], whether in the ER, at her school, in group therapy programs, at outpatient clinics, at inpatient hospitals, or anywhere else, felt she presented a very real risk of self-harm or worse, and deemed the current treatment plan (therapy and medications) totally ineffective. [M.S.] was never released early from a 5150 72-hour hold, and in fact her shortest hospitalization lasted one week. Another lasted five weeks, and the majority of the time [M.S.] was under a 24-hour watch (and again her symptoms failed to improve despite the five-week stay). Medication changes made during these stays also failed to ameliorate her symptoms or improve her mood. [M.S.] has never been hospitalized for meeting any 5150 criteria other than "danger to self," so all these decisions have been made solely due to their assessment that she was in fact a danger to herself. Also, there has never been any clinician in any of those settings who disagreed with previous providers, or felt they erred in feeling [M.S.] was at risk of self-harm and required more intensive, long-term inpatient treatment.

36. In a letter dated September 11, 2018, Amy Yaeger, LCSW, wrote in part:

This therapist began providing weekly school-based individual therapy for [M.S.] on September 15, 2016. This document provides a summary of the safety assessment completed on January 9, 2016, in which [M.S.] disclosed current suicidal ideations and reported on a past suicide attempt.

This therapist met with [M.S.] for a therapy session on January 9th. At this session student visually appeared disheveled and despondent. Upon questioning [M.S.] reported high level of anxiety and depression symptomology. It quickly became apparent that [M.S.] was at risk for safety concerns (highlighted below) so this therapist initiated the Los Altos High School's suicide assessment procedure.

Another therapist, Cherri Duffy, was brought in to help assess for [M.S.] safety. During the assessment student reported for the last two weeks she was actively thinking about suicide 2 to 3 times per day. When thinking about suicide she would say to herself, "If things don't get better, then I'll do it tomorrow." She reported perseverating the idea of going into her family's medicine cabinet and taking whatever pills she could find. Earlier in the week she used fingernail clippers to self harm. When asked about her attitude toward living, she stated, she wanted to die, saw no reason for living and didn't imagine things would get better. When asked what she is looking forward to in the future, [M.S.] said "nothing."

[M.S.] stated that she first began having ideations in 8th grade and that she in fact made an [sic] suicide attempt in 8th grade. She explained further, "I took a bunch of Zoloft. It made me sick but I never told anyone about it." During the assessment with this therapist she stated that she was afraid that she might be driven to make another attempt again.

Due to [M.S.]'s high risk symptoms, unwillingness to contract for safety and past attempt it was recommended by Los Altos High School Therapists Amy Yeager and Cherri Duffy that [M.S.] be transfer [sic] to Stanford Emergency Room for further assessment. She was hospitalized at Mills Peninsula for nine days.

37. Wendy Froelich-Santino, M.D., wrote in part in a letter dated August 16, 2018:

As outlined above, there were multiple suicide attempts, self-harm behaviors, and ongoing instability resistant to all higher levels of care, with the exception of long-term residential treatment. Multiple providers were involved in the recommendation for Wilderness Program and Residential Treatment including the teams at the Intensive Outpatient Programs, as well as the psychiatry and pediatric departments at Palo Alto Medical Foundation. [M.S.]'s family had exhausted all treatment options available in the home setting at the time of these recommendations by [M.S.]'s teams. Both Wilderness Therapy and Residential Treatment have been extremely beneficial and medically necessary for [M.S.].

38. Leena Khanzode, M.D., wrote in part in a letter dated August 19, 2018:

I first met with [M.S.] in December 2016. … I placed her on a 5150 for active Suicidal ideation in [a] follow up visit on 3/20/2017 and she was hospitalized to Mills peninsula hospital again that night. She was discharged from the hospital to Intensive out patient program- Aspire at El camino hospital on 3/28/2017. She completed Aspire program for 10 weeks and was recommended to go to a wilderness program and then to a residential treatment program due to ongoing symptoms of depression and safety concerns "risk of self-harm". I also agreed with their recommendations because of patient's lack of progress and safety issues despite of [sic] intensive therapy. Following which, the patient started Wilderness at Evoke Therapy in Utah in July 2017 and then Kolob Canyon RTC in September 2017.

39. Michael stated that it was the opinion of M.S.'s treatment team that she required the treatment she was receiving at Evoke and that M.S.'s treatment there was medically necessary.

40. In a letter dated November 8, 2018, BSC upheld the denial of payment for M.S.'s treatment at Evoke. The letter stated in pertinent part:

Your request for coverage for [M.S.] for a residential mental health treatment program at Second Nature Entrada [sic] from July 17, 2017, going forward, for the treatment of depression and an eating disorder disorders [sic] has been denied.

The clinical rationale used in making this decision is:

The principal reason is that the medical necessity of treatment at a residential level of care was not established. A review of her medical records submitted to Blue Shield indicates that on July 12, 2017, [M.S.] did not meet the Blue Shield/ Magellan Residential Acute Behavioral Health Level of Care Child or Adolescent guidelines for treatment at a residential program since her mental health diagnoses had not caused significant impairment that could not be managed at a lower level of care; care outside of a residential setting would not cause a serious or imminent danger to herself or to others.

Based on the information from her doctor and facility, [M.S.] can be safely treated at a lower level of care such as an Outpatient mental health treatment level of care. Evaluation and treatment for her mental health symptoms include counseling, therapy, as well as medication treatment and monitoring can be provided in an Outpatient treatment setting. [M.S.] will also be encouraged to participate in community-based resources as part of her treatment to help improve her chances of a longer term successful management of her mental health symptoms.

As per your health plan's benefit description, services that are not medically indicated are not covered. In addition, your appeal has been reviewed by a Child and Adolescent Psychiatrist who agrees that care in a residential care program for [M.S.] from 7/12/17 going forward is not medically necessary. The specialist said:

Note: Specialist's review is NOT edited for language level:

> The published medical literature supports the admission of adolescent patients to residential treatment when there are severe emotional and behavioral symptoms which require 24 hour supervised mental health treatment. A summary of the collated criteria from several peer-reviewed sources of medical literature follows, with a listing of the required criteria symptoms. The symptoms would need to include one or more of: suicidal or homicidal ideation [Criterion not met from 7/12/17, as there were no documentation [sic] in the Evoke wilderness program clinical notes of ongoing suicidal thoughts or homicidal ideation] or self-harming behaviors [Criterion not met from 7/12/17, as the Evoke notes do not document that the patient was engaged in ongoing self-harming acts], serious physical aggression [Criterion not met], impairment in the activities of daily living (ADLs) [Criterion not met, as the Evoke clinical notes do not document  impairments in ADLs], severe alcohol withdrawal symptoms [Criterion not met, as there was no reported drug/alcohol

problems such as addiction or drug withdrawal symptoms], out of control disruptive behavior which cannot be safely managed in an outpatient mental health treatment setting [Criterion not met from 7/12/17-9/27/17], comorbid medical conditions and mental health symptoms which necessitate 24 hour nursing supervision [Criterion not met based on the Evoke clinical progress notes enclosed] (Martin, 2017; Thapar, 2017; InterQual, 2017). As the requested criteria were not met, therefore, the requested service would not be considered medically necessary for this individual based on the current peer-reviewed literature or national guidelines.

## Kolob Canyon

41. M.S. was admitted to Kolob Canyon on September 28, 2017.

42. In an EOB statement BSC denied payment under the justification that:

> A Blue Shield of California Medical Director has reviewed the submitted medical documentation and has determined the service is not medically necessary as established in the Blue Shield of California Medical Policy. Upon request the scientific or clinical judgement used for the determination will be provided to you free of charge.

43. On December 14, 2018, Michael submitted an appeal for the denial of payment of M.S.'s treatment. He contended that BSC had again produced a denial letter which failed to offer any meaningful information concerning the denial or why BSC determined that care was not medically necessary.

44. He reminded BSC that he was entitled to certain protections under ERISA including a full, fair, and thorough review using appropriately qualified reviewers which took into account all of the information he provided using appropriately qualified reviewers whose identities were clearly disclosed and which gave him the specific reason for the adverse determination, referenced the specific plan provision on which the denial was based, and which gave him the information necessary to perfect the claim.

45. Michael stated that BSC's failure to provide him with essential information concerning the identity of the reviewer and the fact that it had provided him with only the most basic information regarding the denial made him skeptical he had been provided with the full, fair, and thorough review to which he was entitled.

46. He stated that M.S.'s treatment had been universally recommended by her treatment team and was necessary to keep her safe and ensure that the treatment she received was effective. He included letters of medical necessity with the appeal, including her discharge summary from Evoke which stated that "if any long-term gains are to be made, she must be in a residential treatment center after Evoke," and "[r]eturning to her home environment, even with intensive outpatient therapy or school accommodations, would most certainly result in significant regression and a return to her previous level of functioning."

47. He wrote that the guidelines BSC made publicly available did not list any of BSC's requirements for residential care and instead referenced a set of guidelines titled "Residential Acute Behavioral Health Level of Care, Child and Adolescent."

48. Michael was able to obtain a copy of these criteria through a third-party source and noted that they required individuals "to exhibit symptoms that are not congruent with the level of care they are receiving." For instance, he noted that BSC's criteria contained requirements such as a danger to self or others and pointed out that these requirements were essentially the same regardless of whether an individual was receiving residential treatment or was receiving care in an acute hospital setting.

49. He contended that this was outside of the norms of generally accepted standards of medical practice and argued that it likely constituted a violation of MHPAEA by placing

requirements on residential treatment services which were stricter than those applied to
analogous medical or surgical facilities such as skilled nursing facilities.

50. He stated that he was not able to find any of BSC's criteria for skilled nursing care
(Which he alleged in and of itself could be a MHPAEA violation if BSC did not require
skilled nursing facilities to comply with specific guidelines), nevertheless he expressed
confidence that BSC did not require individuals receiving non-acute skilled nursing care
to be suffering from acute level symptoms.

51. He asked BSC to perform a MHPAEA compliance analysis on the Plan. Michael
requested to be provided with a copy of all documents under which the Plan was
operated, all governing plan documents, the summary plan description, any insurance
policies in place for the benefits he was seeking, any administrative service agreements
that existed, any criteria used to evaluate the claim, and any reports about the claim from
any physician or other professional. (collectively the "Plan Documents")

52. He asked BSC to evaluate the medical necessity of M.S.'s treatment using the terms of
the governing Plan document rather than any other outside criteria.

53. In a letter dated January 16, 2019, BSC upheld the denial of payment for M.S.'s
treatment at Kolob Canyon. The letter gave the following justification for the denial:

> Your request for coverage at Kolob Canyon where you get treatment both days
> and nights (residential treatment), from September 28, 2017 through October 3,
> 2017 and November 1, 2017 through August 10, 2018, for depression and anxiety
> cannot be approved for payment. The main reason is that it was not medically
> necessary for you to have treatment during the night time. Your care could have
> been safely done in a program where she [sic] did not spend nights at a program.
>
> A review of her your [sic] records submitted to Blue Shield shows that the
> treatment you were receiving from September 28, 2017 through October 3, 2017
> and November 1, 2017 through August 10, 2018 could have been safely given at a
> less monitored level of care. You did not require being watched 24 hours per day.
> You were not a danger to herself [sic] or others. You did not have troubles with

taking care of herself. [sic] You were cooperative in your treatment and participated therapy sessions. [sic] There were no active medical issues complicating her treatment. It did not appear that treatment at a less monitored level of care would make you worse (relapsing) without residential treatment.

As per your health insurance policy, if there are two or more medically necessary services that may be provided for an illness, injury or medical condition, Blue Shield will provide benefits based on the most cost-effective service. Since a lower level of care is more cost effective than a residential treatment program, and you could have been safely treated at a lower level of care; coverage of residential treatment was not medically necessary from September 28, 2017 through October 3, 2017 and November 1, 2017 through August 10, 2018. This decision is based on the 2017 Magellan Care Guidelines as adopted by Blue Shield's MHSA – Residential Behavioral Health, Child or Adolescent, B-902-RES. Please note that Blue Shield will cover continued treatment at a lower level of care. You can contact the Blue Shield/ Mental Health Service Administrator (MHSA) at 1-877-263-9952 to see which in-network programs are available in your geographic area. In addition all non-emergency substance abuse services require prior authorization, which did not happen.

In addition, your appeal was reviewed by an independent mental health doctor who agrees that residential program level of care was not medically necessary from September 28, 2017 through October 3, 2017 and November 1, 2017 through August 10, 2018.. [sic] Her comments were:

*The request for residential treatment care for your child is not approved. It is considered not medically necessary for the treatment of major depression and generalized anxiety disorder. Your child was not a danger to herself or others nor did she have a history of self-harm or require 24 hour nursing supervision.* (emphasis in original)

54. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

55. The denial of benefits for M.S.'s treatment was a breach of contract and caused Michael to incur medical expenses that should have been paid by the Plan in an amount totaling over $150,000.

56. BSC failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite Michael's request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

57. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BSC, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

58. BSC and the Plan failed to provide coverage for M.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

59. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

60. The denial letters produced by BSC do little to elucidate whether BSC conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. BSC failed to substantively respond to the issues presented in Michael's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

61. BSC's lack of due diligence is corroborated by statements it made such as "*nor did she have a history of self-harm*" (emphasis in original) which are directly contradicted by M.S.'s medical history and the appeal letters.

62. BSC and the agents of the Plan breached their fiduciary duties to M.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act

solely in M.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of M.S.'s claims.

63. The actions of BSC and the Plan in failing to provide coverage for M.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

64. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BSC's fiduciary duties.

65. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

66. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

67. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location,

facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

68. The medical necessity criteria used by BSC for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

69. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for M.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

70. For none of these types of treatment does BSC exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

71. When BSC and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

72. BSC and the Plan evaluated M.S.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

73. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, BSC's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that M.S. received. BSC's improper use of acute inpatient medical necessity criteria is revealed in the statements in BSC's denial letters such as "You were not a danger to herself [sic] or others."

74. In addition, the criteria utilized by BSC refer to themselves as acute and in many ways are identical to BSC's criteria for acute hospitalization even though residential treatment and acute hospitalization are distinct levels of care.

75. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that M.S. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

76. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

77. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

78. In addition, the level of care applied by BSC failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

79. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

80. M.S.'s treatment team offered clear and distinct warnings that M.S. was not ready to be treated at home and was at significant risk of regression and her welfare would be endangered if she were discharged from treatment prematurely.

81. Michael noted that he was unable to find any of BSC's criteria for skilled nursing care. Inasmuch as BSC exempts medical or surgical or facilities from the requirements it placed on residential treatment, it violates MHPAEA. This would also be the case if BSC has criteria for residential treatment but did not have any such criteria for skilled nursing care.

82. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BSC, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

83. BSC and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive

capacity the Plaintiffs' allegations that BSC and the Plan were not in compliance with MHPAEA.

84. In fact, despite Michael's request that BSC and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, BSC and the Plan have not provided Michael with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, BSC and the Plan have not provided Michael with any information about the results of this analysis.

85. The violations of MHPAEA by BSC and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f)  An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

86. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.      Judgment in the total amount that is owed for M.S.'s medically necessary treatment at Evoke and Kolob Canyon under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 7th day of June, 2022.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Santa Clara County, California.

22